# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00262-CR

---

**Mitchell Janzen George, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 453RD DISTRICT COURT OF HAYS COUNTY
### NO. CR-18-0292, THE HONORABLE DAVID JUNKIN, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Mitchell Janzen George challenges judgments of conviction for four counts of third-degree felony stalking. *See* Tex. Penal Code § 42.072(a)–(b). We will affirm the judgments of conviction.

## BACKGROUND

The State of Texas prohibits stalking. As relevant here, the statute reads:

(a) A person commits an offense if the person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that:

    (1) constitutes an offense under Section 42.07 [harassment], or that the actor knows or reasonably should know the other person will regard as threatening:

        (A) bodily injury or death for the other person;

> (B) bodily injury or death for a member of the other person's family or household or for an individual with whom the other person has a dating relationship; or
>
> (C) that an offense will be committed against the other person's property;
>
> (2) causes the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person's property, or to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and
>
> (3) would cause a reasonable person to:
>
> (A) fear bodily injury or death for himself or herself;
>
> (B) fear bodily injury or death for a member of the person's family or household or for an individual with whom the person has a dating relationship;
>
> (C) fear that an offense will be committed against the person's property; or
>
> (D) feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.

*Id.* § 42.072(a).

George was indicted on four counts of stalking arising from phone calls and other communications George made to faculty and staff of Texas State University in January of 2015 regarding the university's April 2013 decision to expel him. George waived his right to a jury trial and pleaded not guilty. The State approved his waiver and tried the case to the bench in January of 2019, calling nine witnesses: Danielle Maxwell, a romantic partner of George's from 1996 through 2009 and a former Texas State student; Timothy Bonner, Ph.D., a professor and one of the alleged victims; Janet Wisian, an administrative assistant to Dr. Bonner at the time of

2

the alleged incidents; Ismael Amaya, the assistant dean of students; Joanne Smith, Ph.D., vice president of student affairs and one of the alleged victims; Lora Chafin, Dr. Smith's executive assistant and one of the alleged victims; Denise Trauth, Ph.D., president of the university and one of the alleged victims; Jenny Van de Walle, Dr. Trauth's receptionist at the time of the alleged incidents; and Rolando Belmares, a detective with the university's police department. The defense did not call any witnesses, and George did not testify.

Maxwell took the stand first[1] and testified that she and George began dating in high school and then attended college together, first at Austin Community College and then at Texas State. She said that over time the relationship had "gotten abusive," leading her to end the relationship in 2009. She indicated that George "reacted poorly" to the break-up and would "repeatedly contact [her] through e-mail and phone and eventually [she] had to tell him to stop contacting [her]" in January of 2010. She explained that at some point thereafter, George informed her that "he had registered for a lot of classes" in the building where Maxwell was "doing most of [her] graduate research." This led Maxwell to notify Dr. Bonner, her academic advisor and the director of the building, of her concerns, and to file a formal complaint with the university's "student justice program." She later notified Amaya of alleged violations of the code of student conduct. When George failed to abide by the justice program's "admonishment" not to contact Maxwell, Maxwell called university police, who ultimately arrested George when he interfered with Maxwell's instruction of a zoology lab.

Dr. Bonner testified that he had supervised Maxwell's studies and that George had attended several field trips with Dr. Bonner's department. Dr. Bonner indicated that he was

---

[1] The defense asked for a running objection to Maxwell's testimony under Rule of Evidence 404(b). The court allowed the running objection but overruled it.

initially "vaguely" aware of the relationship between the two students and had a "very favorable impression" of George. He said his impression "changed" when he had a "one-on-one conversation" with George following Maxwell's report of unwanted contact. Dr. Bonner recalled that George did not react well when asked to cease contact with Maxwell and that Dr. Bonner "no longer wanted to have another conversation with him." Dr. Bonner then described George contacting him through a series of obscenity-laced phone calls and e-mails, which Dr. Bonner said he reported to the university police and to university administration. He said that most of the calls were intercepted by Wisian but that a few were transferred directly to him by the university switchboard, at which point he would "hang up." Dr. Bonner described Wisian as "very rattled" and "absolutely" afraid of George when she intercepted his calls.

Dr. Bonner then described an incident in July of 2014 in which he ran into George at a local grocery store. Dr. Bonner denied any physical contact between the two but said that George allegedly "started getting very loud and vocalized to the point he was screaming at me while I was standing in line." This allegedly continued until Dr. Bonner "walked out the door" and "contacted law enforcement." San Marcos police responded to the incident and wrote George a warning for criminal trespass. Bodycam footage shows George refusing to sign the warning and referring to Dr. Bonner as a "liar," a "cheater," a "homewrecker," an "adulterer," and a "rapist." Dr. Bonner also testified that university police had notified him that George had "put up a placard saying [Dr. Bonner] was raping and sleeping with students." Dr. Bonner recalled that he felt "absolutely" "threatened" by George's behavior because Dr. Bonner "had no idea" "what [George] was capable of" and was concerned that George "could get physical or violent."

4

Wisian testified that George had spent "years" trying to contact Dr. Bonner and that the calls occurred "daily" for "several weeks." She indicated that she would not put his calls through, that she was Dr. Bonner's first line of "defense," and that she had asked him to stop calling "numerous times." She testified that she notified Detective Belmares every time the office received a call or e-mail from George. She explained that the calls sometimes left her "shaking" because George was "very angry" and "[t]here was a lot of foul language used."

Amaya testified and indicated that, upon receipt of Maxwell's complaint regarding George's behavior, he convened an "informal" meeting:[2]

> [T]he gist of it was I was trying to relay for Mr. George to cease contact with [Maxwell], [to] let her proceed with whatever she needed to. You know, she wanted to move on. What I would have described as a warning, leave it alone, leave alone and that was what I was trying to get to. He did not respond well to that and he wanted to—he would not let it go. He would not let her go and wanted to file counter[-]grievances against her.

Amaya explained that "multiple people" within his office began receiving "harassing calls and messages" and said that, at that point, he referred the case to Dr. Smith. He recalled that Dr. Smith ultimately determined that George could "never return to Texas State."

Dr. Smith testified and, when asked why she became involved in the case, explained:

> There was the disruption that was occurring and the numerous calls that were being made and some of the profanity that was being used in the calls he made; numerous, numerous calls. . . . [H]e was trying to make calls to [Maxwell]. He was trying to make calls—he called our office many, many times. He called the President's Office many, many times and he was trying to basically get us to drop all those charges.

---

[2] It is unclear from the record when this meeting occurred, but it must have taken place sometime between early 2010 and George's expulsion in April of 2013.

5

When asked to describe a typical call, Dr. Smith recalled, "Pretty much the [f---] word quite a bit and [he] said we were incompetent and we were unprofessional, we ruined his life . . . [t]hose kind of things." When asked how her office responded to his calls, she said:

> [We] indicated to him was that he could not come back to campus until we had an indication that he was not going to be disruptive to the university community or to individuals at the university . . . a letter from a mental health psychiatrist or psychologist that would indicate he would not be disruptive.

She indicated that she became most concerned when George made an ominous threat that "if [Smith] cared about [her] marriage," she "would take care of" his case and "get him back in school." She testified that she construed the comment as a threat to the safety of her family.

Chafin testified as Dr. Smith's executive assistant, which she described as a position responsible for "calendaring and scheduling." She reported that George met with Dr. Smith and then called her office "several times." She said that for weeks he would call "everywhere from one to as many as a couple of dozen times" per day. When asked how the office staff would respond to the calls, Chafin recalled that they "pretty much always told him the same thing." Specifically, the office informed George that he "ha[d] been expelled," "can't call back," and "do[es]n't need to call." She remembered one instance in which "[h]e told [Chafin] specifically he basically could call every f-G day all f-G day long if he wanted to." Chafin remembered that the calls progressed from "civil" to "very aggressive" and described the office's "grave concern sometimes depending on the language and the context and what [George] was saying."

Dr. Trauth testified that in January of 2015, her receptionist, Jenny Van de Walle, "had taken a telephone call in which [George] had threatened to kill" Dr. Trauth. She indicated that she took the threat "seriously" and that it "was of great concern." Dr. Trauth testified that

6

she could not remember how many calls her office had received from George but that she obtained "additional police protection" following the threat. She described her discomfort in the period following the call as she maintained her daily routine of leaving her home at 6:20 each morning:

> I can remember at that—during that period feeling very vulnerable. As I walked out the front door [of the president's house], it's lit. I'm walking down steps and as I said it's a predictable pattern. I do it a lot. If a person was interested in finding me by myself in a sort of isolated environment, that would be it. So, it's those kinds of things I think are always in the back of your mind.

She then indicated that she had served as president since 2002, had received death threats in the past, and has "always" taken them "seriously."

Van de Walle testified and recalled that George had called "three days in a row" in January of 2015. She described George as initially "calm" when he first asked to speak to Dr. Trauth about his case. She explained that his demeanor changed when he was told she would not take his call:

> I let him know he was not able to speak with her directly and he did get agitated and asked if Timothy Bonner was the primary objector in the case. I was unfamiliar—he did not say what case it was and at this point that's the first time I had ever talked to him and then just said that I needed an answer from her and he would call back but I did not answer any phone call from him if he called back that day.

Van de Walle reported that the following day George called "three times in one minute," with the office refusing to accept his call. She then recounted his call the following day and another call a few days later:

> The 20th [of January] was the most aggressive day. He called and started ranting about his situation and then he said that Dr. Trauth had killed his life and she

7

deserved to feel what it felt like to have hers killed. . . . He said that [Trauth] should look up the definition of "kill" in the dictionary so she didn't misconstrue the message.

Van de Walle said she interpreted the statements as a "threat" to "Dr. Trauth's life," that he seemed "completely serious," "very direct," and that she reported the call to her immediate supervisor and to Dr. Smith's office.

Belmares testified as the "lead investigator" with the university police at the time of the alleged stalking. He reported that the department received reports of "8 or 9" incidents involving George and that the department obtained a warrant for George's arrest. When asked to describe the nature of the complained-of conduct, Belmares described it as "harassment." When asked to clarify, he added that there were "[a]ll different types phone calls, escalating to stalking." He explained that one complaint—the complaint that George had threatened to "kill" Dr. Trauth—was classified as a "terroristic threat." He recalled that George had been an ongoing problem for "a long time" and that the department had to increase its patrol of Dr. Bonner's building and Dr. Trauth's office. He concluded by saying there was "a lot of concern" for "the safety of Dr. Smith and Dr. Trauth."

In support of its arguments, the State offered a video recording of George's encounter with San Marcos police and three lengthy audio recordings of voicemails left for Texas State administrators. In the voicemails, George insists that the calls should not be considered "harassment" but then proceeds to use profanity and racial slurs to describe Texas State administrators. He also asks administrators to "ban all women" from attending the university. The State also offered a three-page e-mail he sent to another university complaining of how unfairly he had been treated by Texas State administrators. In addition, it offered letters

8

written by two of George's family members asking the judge to exercise leniency in the case. George offered, in his defense, only one exhibit: a set of business records indicating that he resided in Denver, Colorado, at the time the offensive phone calls took place.

After the parties made closing arguments, the trial court found George guilty of all four counts of stalking. The court assessed George's punishment at terms of confinement ranging from two to five years for each count but suspended imposition of the sentences and placed George on five years of community supervision. George timely filed this appeal.

## DISCUSSION

George has briefed three broad issues on appeal. First, he raises several constitutional challenges to Section 42.072 of the Penal Code. Second, he argues that the State failed to prove an element of one of the counts in that "George did not knowingly threaten Dr. Denise Trauth, nor was any threat intended." And third, he contends the "testimony of Denise Maxwell should have been excluded as improper 404(b) evidence" that is "more prejudicial than probative."

**Constitutional Challenges**

George makes three constitutional arguments on appeal. First, he contends the stalking statute "result[s] in generically unusual punishments in violation of the eighth and fourteenth amendments to the United States Constitution and in violation of Article I, § 13 of the Texas Constitution." Second, he contends that "the language of the 2013 amendment to § 42.072 is too vague and overbroad as to stalking" in that it prohibits conduct protected by the First Amendment. Third, he contends that the statute, as applied in this instance, "has resulted in disproportionate charging and sentencing."

9

Before addressing the merits of George's constitutional arguments, we must determine whether he preserved those arguments for review. *See Obella v. State*, 532 S.W.3d 405, 407 (Tex. Crim. App. 2017) ("[I]t is the duty of the appellate courts to ensure that a claim is preserved in the trial court before addressing its merits." (quoting *Wilson v. State*, 311 S.W.3d 452, 473 (Tex. Crim. App. 2010))); *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) (stating that appellate courts should not address merits of issue that has not been preserved for appeal). To preserve error for appellate review, a party must make a timely and specific objection at the earliest possible opportunity and obtain an adverse ruling from the trial court, and the complaint on appeal must correspond to the objection made at trial. *See Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014).

The record before us reveals that George did not raise any of these challenges at trial with any specificity and did not file a motion for new trial. Nor did George obtain a ruling on his arguments.[3] Moreover, we have no authority to "revisit" binding precedent establishing the standards for preservation of constitutional challenges to statutes, *see Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009) (setting forth standard), which George urges the Court to do. Thus, because George failed to preserve the constitutional complaints, we overrule his arguments. *See* Tex. R. App. P. 33.1(a).

---

[3] We disagree with George's contention that his closing guilt-innocence argument, which asserted, at one point, that his conduct was constitutional—"Profanity is not unconstitutional. . . . [George] has a Constitutional right to complain."—sufficed to inform the trial court that he was asserting constitutional challenges to the stalking statute, particularly the challenges he now asserts on appeal. We likewise disagree that the trial court's finding of guilt constituted an "implicit ruling" on any purported constitutional challenge to the statute raised in closing argument.

**Sufficiency of the Evidence**

George challenges the sufficiency of the evidence to support his conviction for stalking Dr. Trauth as alleged in Paragraph B of Count IV of the indictment, noting that the Count IV conviction resulted in the lengthiest of his suspended terms of confinement. That paragraph reads:

> On or about the 20th day of January, 2015, in Hays County, Texas, the Defendant, Mitchell Janzen George, did then and there, and pursuant to the same scheme and course of conduct directed specifically at Denise Trauth, engage in conduct that he knew and reasonably believed that Denise Trauth would regard as threatening bodily injury or death for her, which conduct caused Denise Trauth to be placed in fear of bodily injury or death, and which conduct would cause a reasonable person to fear bodily injury for herself; to wit: on or about the 20th day of January, 2015, the Defendant made repeated harassing telephone calls to Denise Trauth's place of employment and stated that Denise Trauth killed his life and should know how it feels to have her life killed.

Specifically, George challenges the evidence in support of the requisite finding that George knowingly engaged in conduct that he knew or reasonably should have known Dr. Trauth would regard as threatening the bodily injury or death of herself or her family or household members. *See* Tex. Penal Code § 42.072(a)(1)(B).

Under a legal-sufficiency standard of review, appellate courts view the evidence in the light most favorable to the verdict and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "When conducting a sufficiency review, we consider all the evidence admitted, whether proper or improper." *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013).

When performing this review, an appellate court must bear in mind that it is the factfinder's duty to weigh the evidence, to resolve conflicts in the testimony, and to make

11

"reasonable inferences from basic facts to ultimate facts." *Id.* The factfinder is "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence." *See Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007).

Furthermore, appellate courts presume that conflicting inferences were resolved in favor of the conviction and "defer to that determination." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Courts also must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). However, factfinders "are not permitted to come to conclusions" based on mere speculation or on inferences or presumptions that are not factually supported. *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *See Kiffe*, 361 S.W.3d at 107 (quoting *Jackson*, 443 U.S. at 320).

Here, George denies there is any evidence that he knew or reasonably should have known Dr. Trauth would regard his conduct as threatening physical harm, arguing that he was in Denver at the time of the complained-of conduct and that he intended his threat to "kill" her as strictly figurative in nature. He emphasizes that the threat was immediately preceded by his

12

complaint that Dr. Trauth had "killed" him—presumably a reference to George's expulsion from the university. Thus, given that Dr. Trauth had not, in fact, physically harmed George or caused his death, George contends that the only reasonable interpretation of his remarks is that George was speaking figuratively and could not have known that Dr. Trauth would misinterpret his language. But even accepting George's characterization that he did not, in fact, know that Dr. Trauth would regard his language as a threat of death or physical harm, the question is whether George *reasonably should have known* that Dr. Trauth would regard the language as such. On this record, there is sufficient evidence from which a factfinder could infer that George reasonably should have known how Dr. Trauth would construe the language and conduct.

First, George's threat to "kill" Dr. Trauth was not his only communication with her office. Van de Walle testified that George had initially called the office "three days in a row"—on the 13th, 14th, and 15th of January, including one day in which George called "three times within one minute." She testified that the calls were initially "very calm" but that George became increasingly "agitated" and "aggressive" with the realization that he would not be permitted to speak directly to Dr. Trauth. Van de Walle and others testified that the calls were often laced with profanity. These calls escalated to the final conversation on the 20th of January, when George "started ranting" and threatened to "kill" Dr. Trauth. Moreover, the fact that George followed up by saying Dr. Trauth "should look up the definition of 'kill' in the dictionary so she [would]n't misconstrue the message" only underscores that George should have known how his language would be understood, as the dictionary defines "kill" as "to end life; to cause physical death." *See Black's Law Dictionary* (11th ed. 2019). On this record, given the entire course of escalating and increasingly aggressive behavior toward Dr. Trauth, a reasonable factfinder could have concluded that George should have known Dr. Trauth would regard his

13

comments and conduct as threatening the bodily injury or death of herself or her household members. *See Harris v. State*, No. 14-15-00679-CR, 2016 WL 5399789, at *2 (Tex. App.—Houston [14th Dist.] Sept. 27, 2016, no pet.) (mem. op., not designated for publication) (affirming stalking conviction after deeming text message stating, "I'm going to kill you," sufficient evidence that defendant "should have known" message would place recipient "in fear for her life"). And to whatever extent there is room for the competing inference proffered by George—that he could only have reasonably anticipated that the threat would be construed figuratively—we must resolve the competing inferences in favor of the court's finding. *See Clayton*, 235 S.W.3d at 778. Thus, the evidence is sufficient to support the trial court's finding of guilt as to this allegation.

Moreover, Count IV charged George with stalking in two paragraphs, which alleged alternate manners and means. Accordingly, the indictment authorized a conviction on either theory of liability alleged in Count IV. George challenges only the sufficiency of the evidence as to the second paragraph. The trial court explicitly found George guilty of both paragraphs of Count IV. *Cf. Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013) (observing that when alternative theories of liability are submitted in jury charge, guilty verdict will be upheld if evidence is sufficient on any theory authorized by jury charge); *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (same). Thus, because the record demonstrates that the evidence is sufficient to support the conviction for Count IV, we overrule the issue.

14

**Evidentiary Challenge**

Finally, George challenges the admission of Maxwell's testimony, arguing that the admission violates Rules 403 and 404(b) of the Rules of Evidence. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *see also Dabney v. State*, 492 S.W.3d 309, 316 (Tex. Crim. App. 2016) ("[B]ecause trial courts are in the best position to decide admissibility questions, appellate courts must review a trial court's decision under an abuse-of-discretion standard."). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). Further, we may not reverse the trial court's ruling unless the "decision falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see also Henley*, 493 S.W.3d at 83 ("Before a reviewing court may reverse the trial court's decision, 'it must find the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008))). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93 (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

The erroneous admission of evidence generally is considered non-constitutional error. *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007); *see also Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (explaining that erroneous admission of evidence was non-constitutional error). Non-constitutional error requires reversal only if it affects the substantial rights of the accused. Tex. R. App. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93

(Tex. Crim. App. 2011); *see also* Tex. R. Evid. 103 (stating that trial court error admitting or excluding evidence must affect "substantial right of the party"). In making this determination, we "consider everything in the record." *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002); *see also Barshaw*, 342 S.W.3d at 93; *Solomon*, 49 S.W.3d at 365.

As with George's constitutional challenge, we must confirm preservation of error before we may turn to the merits of George's arguments. *Obella*, 532 S.W.3d at 407. The State contends that George failed to preserve any error under Rule 403, arguing that he "made no Texas Rule of Evidence 403 objection during the trial, but attempts to so argue on appeal." We agree. When the State called Maxwell to the stand, defense counsel interjected:

> I'm going to object to what is essentially going to be 404-B testimony coming from this witness. She never received a phone call during [sic] January 14th and January 20th. She wasn't even in the State of Texas. I understand why she's being called but I think it's untimely. They have to establish a case first before they can bring in extraneous offenses. This is an extraneous witness. She has no information that relates to the actual offense that has been charged in this case. All of her information is going to be background and some of it is 15 years old.

Counsel did not refer to Rule 403 in name or in substance. *See* Tex. R. Evid. 403 (allowing trial courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence"). The only mention of Rule 403 in the reporter's record is in an objection to Amaya's testimony, which is not at issue on appeal. Because George did not raise an objection to Maxwell's testimony under Rule 403 at trial, we do not reach his arguments regarding that Rule.

George also contends that Maxwell's testimony was inadmissible under Rule 404(b). That Rule provides, "Evidence of a crime, wrong, or other act is not admissible to prove

16

a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Id*. R. 404(b)(1). The Rule, however, includes a clarification: "This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id*. R. 404(b)(2). Under Rule 404, evidence "may also be admissible to provide a context for the charged offense." *Haines v. State*, No. 03-00-00765-CR, 2001 WL 987348, at *5 (Tex. App.—Austin Aug. 30, 2001, no pet.) (mem. op., not designated for publication) (citing *Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993)).

On this record, the trial court did not abuse its discretion in overruling defense counsel's Rule 404(b) objection. First, the court reasonably could have concluded that Maxwell's testimony provided the context necessary to understand the allegations. *See, e.g.*, *Vanorman v. State*, No. 09-15-00286-CR, 2016 WL 5341962, at *7 (Tex. App.—Beaumont Sept. 21, 2016, pet. ref'd) (mem. op., not designated for publication) (holding evidence of long-term romantic relationship and years-earlier incidents admissible in part to establish context of present allegation of burglary of habitation). It was Maxwell's report of harassment to Dr. Bonner and Amaya that led to George's involvement with those two individuals, and ultimately led to his involvement with all four victims in the case. In fact, Amaya testified that he and the others likely would not have "had any contact" with George in absence of Maxwell's report. Moreover, the court reasonably could have concluded that Maxwell's testimony provided the motive behind the complained-of conduct. *See, e.g.*, *Becknell v. State*, 720 S.W.2d 526, 530 (Tex. Crim. App. 1986) (referring to evidence of earlier "bad grades" as likely motive in murder of professor); *Davis v. State*, No. 01-10-00539-CR, 2011 WL 5026403, at *5 (Tex. App.—Houston [1st Dist.] Oct. 20, 2011, pet. ref'd) (mem. op., not designated for publication) (holding

17

evidence of multiple romantic relationships admissible to show possible motive and to rebut affirmative defense).  Maxwell testified that she initially contacted the student justice program for help with her conflict with George but that he failed to cooperate, leading her to escalate the reports of misconduct such that Dr. Trauth and her staff were kept "apprised" of the situation until Dr. Smith ultimately decided to expel George from the university altogether.

Moreover, even if we were to hold Maxwell's testimony inadmissible under Rule 404(b), we would conclude that George has not shown how his substantial rights were affected by that abuse of discretion.  *See* Tex. R. App. P. 44.2(b).  The record reflects that at least two other witnesses—witnesses whose testimony George does not challenge as inadmissible on appeal—testified to the same historical context that Maxwell provided to the court.  Further, evidence supporting the trial court's verdict was overwhelming, with the testimony regarding George's intimidating communications, his "aggressive" course of conduct, and the ultimate impact on the victims entirely undisputed by the defense.  Thus, after examining the record as a whole, we would conclude that any abuse of discretion in admitting Maxwell's testimony had little or no impact on the verdict.  *See Motilla*, 78 S.W.3d at 355.  We overrule the issue.

## CONCLUSION

Having overruled George's issues on appeal, we affirm the judgments of conviction.

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed: March 31, 2021

Do Not Publish